Filed 11/10/22  P. v. Rivera CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>JULIO CESAR RIVERA,<br><br>        Defendant and Appellant. | F082815<br><br>(Super. Ct. No. F20907555)<br><br><br>**OPINION** |

-ooOoo-

        APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

        Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Cavan M. Cox II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Julio Cesar Rivera was convicted by jury of five offenses arising out of a domestic violence incident with his girlfriend occurring in front of their two children. Defendant was convicted of willful infliction of corporal injury (Pen. Code, § 273.5, subd. (a),[1] count 1); making a criminal threat (§ 422, subd. (a), count 2); false imprisonment effected by violence (§§ 236, 237, subd. (a), count 3); and two misdemeanor counts of willful endangerment of a child (§ 273a, subd. (b), counts 4 & 5). Defendant admitted a prior serious felony conviction allegation.

Defendant was sentenced to an aggregate term of seven years four months, as follows: The court imposed the middle term of three years on count 1 (§ 273.5, subd. (a)) doubled to six years for the prior strike (§ 667, subd. (e)(1)); a consecutive term of 16 months on count 2 (§§ 422, subd. (a), 1170, subd. (h)(1)) (one-third the two-year middle term, doubled for the prior strike (§ 667, subd. (e)(1)); a concurrent middle term of two years on count 3 (§§ 236, 237, subd. (a), 1170, subd. (h)(1)), doubled to four years for the prior strike; and time served as to misdemeanor counts 4 and 5. Defendant timely appealed.

Defendant argues the trial court erred by not giving a unanimity instruction with respect to the criminal threat charge, denying his *Romero*[2] motion, and failing to stay the punishment for the false imprisonment conviction under section 654. The People dispute defendant is entitled to any relief, but they note the abstract of judgment with regard to count 3 should be corrected because it incorrectly indicates the term imposed was stayed.

**FACTUAL BACKGROUND**

L.C. testified she dated defendant for about 14 years, and they had two children together, J.C. and I.C. Theirs has always been a tumultuous on-and-off-again relationship, complicated by defendant's methamphetamine drug use. The jury was

---

[1] All statutory references are to the Penal Code unless otherwise indicated.
[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

informed the parties stipulated to the fact defendant had been convicted on July 23, 2013, under section 136.1, subdivision (b)(1), for dissuading a witness—i.e., L.C.; and for violating section 273.5, subdivision (a), causing corporal injury to L.C.

L.C. testified that in January 2016 she and defendant had an argument where defendant pulled her hair, kicked her, and "threw [her] around like a rag dog." She was eventually able to get away and called the police. The next day, she and defendant fought again. Defendant was using methamphetamine and would not let her leave the argument. The altercation became physical, she ran and he chased her, and she ended up calling the police from a nearby elementary school.

On October 15, 2020, L.C. and her kids were living with L.C.'s sister, E. The week before, E. had kicked L.C. and the kids out of her house because defendant had made a scene. L.C. and the kids had been in a car with defendant when L.C. told defendant she wanted to end the relationship. Defendant would not let her out of the car, but she and the kids eventually did get out of the car and ran back to the house. Defendant chased them to the house and would not let them close the door. He was always making scenes at E.'s house, forcing himself into the house, and yelling at the kids and L.C.'s family. When E. told L.C. to leave, she took the kids to a motel and defendant "tagged along." Eventually, L.C. went back to E.'s house around October 12 or 13, 2020, after she convinced E. she had nowhere else to stay.

Defendant was renting a room in someone else's house. L.C. had a vehicle that defendant said he bought for her and the kids and that she had been using for about a week before the October 15, 2020, incident. On the day of October 15, 2020, defendant contacted L.C. by phone, and kept calling and calling. He showed up at E.'s house around 10:30 p.m., even though L.C. had told him not to come over. When he showed up, she talked to him in front of the house. He told L.C. she had better get in the car or he would help her do so, which she took to mean he would force her to do so. He also wanted the kids to come with them.

3.

She went back into the house, packed a few things, and got the kids into the car. Defendant was completely silent the whole car trip, there were no arguments. She suspected he was on methamphetamines again, and she tried not to talk to him in the vehicle. The kids were also completely silent, sitting in the backseats. They checked into a motel room with two beds, and once they were in the room, the kids huddled on one bed, and defendant grabbed L.C.'s hair and dragged her to the other bed. He put L.C. on the bed and then got on top of her, placing his knee on her chest.

Defendant accused her of bugging his phone, trying to locate and track him, and planting text messages and emails on his phone. L.C. did not know what he was talking about, but this was not the first time he had accused her of doing something to his phone. She tried to explain she had no way to mess with his phone, and she had no idea what he was talking about, but then he was accusing her of cheating during their relationship.

He would alternate between allowing her to get up, and then he would pin her down again on the bed with his knee to her chest, grabbing her hair, and yelling. He asked her questions such as whether she loved him and if they were going to get married, but none of her answers seemed to be what he wanted to hear. When he tried to hit her, she put her hand up, and he made contact with her wrist and palm; he tried to slap her, but she was able to dodge the blow. He left bruises all over the left side of her body.

During this time, he lectured her about how much money he was going to make and how easily he could get another girlfriend, better kids, and a better family. She told him to "go for it," and that made him angry. He told her that if she reported what happened that night, even if he went to prison, he was going to do his time easily and when he got out, he was going to kill her and her family. He also told her he was going to get a gun from someone he knows, which he said more than once that night. He threatened to kill her and her family five or six times, and she was scared. He told her that if she tried to leave the hotel room, he was going to stop her. She was concerned

4.

about leaving the kids with him, she never screamed or he would have hit her even harder. She had bruises on her face from where he was tapping on her forehead.

Usually when he was high on methamphetamines, he would force her to have sex. He tried to initiate sex that night at the motel, but she did not want to, and they did not have sex. The entire episode went on until around 5:00 a.m., when defendant's alarm went off to remind him to go to work. Neither L.C. nor the kids slept the entire night; although she was unable to observe the kids all night, they seemed to be hugging each other and they were silent the whole time.

Defendant told L.C. to get their things together because he had to go to work. They dropped the kids off at E.'s house, and she stayed in the vehicle while he drove to his workplace. When they arrived, he told her to get in the driver's seat, but as he started walking away, he was yelling things at her like she was worthless and all the typical things he would say to her. L.C. drove to her sister's house, picked up the kids, and drove to a different sister's house in Fresno.

As soon as she dropped him off at work, defendant began calling and texting her, and this went on all day. She did not listen to the voicemail messages. He told her he wanted the car back, and he said that he was going to have plenty of money and insinuated he could kill her without getting his hands dirty. He also communicated he was going to call the police and report the car stolen. Several of his text messages from that morning were admitted into evidence, including one that said, "'You have 15 minutes to bring the [vehicle], fucking retard. Either you call me or bring the [vehicle]. 15 minutes call me. You'll see if you don't.'" She took this to mean he was going to do something to her if she did not return the vehicle.

L.C. communicated with defendant's cousin Sonia about the vehicle for a few days after the incident, but then L.C. told Sonia she was done and stopped answering Sonia.

5.

L.C. did not immediately report what had happened with defendant because she was scared that defendant would kill her family. She went to the Selma Police Department on October 29, 2020, because a week prior there had been a suspicious Honda or Lexus hanging around, both cars defendant's cousin owns, and there were two big guys in the front seat. She believed defendant found out where she was, and so she became frightened and reported what had happened. She requested an immediate protective order, which she received. She turned over photographs her sister had taken three or four days after the event that showed bruises on L.C.'s rib cage, and a bruise on her leg where defendant had dragged her.

The police officer to whom L.C. reported these events said she appeared to be crying and trembling, and paused a lot when providing her statement.

L.C.'s six-year-old son J.C. testified defendant is his dad and L.C. is his mom. The last time he saw his dad was at a motel room where his mom and big sister were also. This was not a happy time; mom was not happy and dad was mad and mean. Dad said he was gong to buy a pistol and kill the whole family. He heard dad being mean to mom, and he was putting his knee on mom's chest. He saw mom and dad without clothes on, and dad was still being mean. He called mom a lot of names.

L.C.'s 10-year-old daughter I.C. testified defendant is her dad and L.C. is her mom. The last time she saw defendant was in a motel room with her brother and her mom. She was scared in that room; mom and dad were not happy; dad was angry. She heard him say mean things to mom; he said he was going to kill mom and leave I.C. and her brother in the desert. He only said that one time, and it was in the truck before they got to the motel. She did not hear any mean things after they got to the motel, but she did see dad touch mom meanly at the motel, and she saw dad get on top of mom. Her parents both had clothes on. Dad was yelling really loud and that scared her; she tried to comfort her brother by hugging him while they were sitting on a bed. She heard dad talk about a gun and that he was going to get a gun, and she saw him hit mom in the back of the head.

6.

She could not remember if he pulled mom's hair. She did not think they slept, but they were not at the motel long and they went home before the sun came up. She felt scared for her mom, but dad was nice to I.C. and her brother.

Both children took part in forensic interviews on November 10, 2020, which were recorded and played for the jury. Although there were discrepancies, the children's interviews reflected defendant was angry with L.C. on October 15, 2020, that he hit L.C., held her down with his knee, pulled her hair, called her names, and made threats against her.

Defendant testified on his own behalf. He confirmed L.C. is the mother of his two kids, and they had been in a relationship since high school. On the date of the incident, they did not live together, and L.C. had gotten hold of him through a video call when he was at home. She wanted to get a motel room, although she did not say why; she had done that in the past. He did not want to because he was tired and did not have the money for it. He was ready to break up with her; she had been accusing him of cheating and she was not putting any effort into the relationship or looking for a place they could live with the kids.

She called about three times, and defendant went outside to wait for her. L.C. arrived in her car with the kids. L.C. wanted him to follow her in his car so she could drop off her car because her dad needed it for work. After they dropped off her car, she wanted to get clothes and stuff for the kids. After she did that, she got back into his vehicle. They did not talk on the way to the motel. As soon as they got in the room, she demanded to see his phone and started going through it, asking him why he had 30 email messages. She accused him of cheating, and he told her they were going to break up if she kept accusing him.

He laid on the edge of the bed; she wanted sex, but he did not feel like it. She was upset, and they did not talk much. She accused him of cheating, he told her the relationship was over, and she said he was never going to see his kids again. Eventually

7.

she laid down on the bed. Defendant woke up at 5:00 a.m. because he had to get back to work; he did not interact with L.C. She grabbed stuff and got the kids ready, and they all got in the vehicle and drove to a breakfast place. L.C. said she needed his car for a doctor's appointment, so she left the kids at her sister's house and dropped him off at work. She was supposed to pick him up after work, but she refused and would not give his vehicle back. He communicated to her he was going to report the vehicle stolen.

Defendant denied he was under the influence of anything that night, although he had drug issues in the past. He had been clean since November 2019 after successful completion of a rehabilitation program. He said L.C. got kicked out of her sister's house the week before the incident because L.C. was drunk and said mean things to her sister. Defendant was outside E.'s house while this was happening, and he told L.C. not to say things like that to her sister since she was giving L.C. and the kids a place to stay.

L.C.'s jealousy had been going on for a long time, although he had never cheated on her. He never called her any names, just what was in the text messages that day after the incident when she took his vehicle and refused to come back and pick him up. He got a call from his mother asking what was going on, and he told her L.C. did not want to give the car back, that he was done with L.C., and that he was reporting the car stolen. He was not angry when he sent the text messages to L.C., he just wanted his vehicle back. When confronted with a message in which he called L.C. a "worthless whore," he testified he could not remember what he was feeling.

The day he was arrested, about two weeks after the night in the motel, he had told L.C. he was out with another girl. This was untrue, but he wanted his car back. L.C. made up the incident about the night in the motel and reported it to police because she found underwear in his car that was actually L.C.'s, but she thought it belonged to someone else. He stopped trying to communicate with L.C. around the 17th or 18th of October, he was too busy working and he did not know what to do; he did not want to report the car stolen and get her into trouble.

8.

Defendant denied being physically abusive with L.C. in any way on October 15, 2020, and he never threatened to kill her; he never made a threat to cause her any injury. L.C. has been badmouthing him to the kids; all of her testimony was lies, as were J.C.'s and I.C.'s testimony.

## DISCUSSION

### I.    Unanimity Instruction

Defendant contends the trial court prejudicially erred by failing to give a unanimity instruction (CALCRIM No. 3500) on the criminal threats charge because there were multiple threats that suggested more than one discrete criminal threat crime.

#### A.    Background

Defendant was charged and convicted of one count of making a criminal threat against L.C. under section 422, subdivision (a).  Witness testimony reflected different threats defendant made against L.C. over the course of about five or six hours on the night of October 15, 2020, and threats he made against L.C. in text messages later in the morning and day of October 16, 2020, after they left the motel.  These threats included the following:

- When defendant picked L.C. and the kids up, he told L.C. that she "better get in the car."  She testified when he said this, defendant was "real blank and just showing no emotion, just real quiet.  Just told me very angrily, mad, to get in the car or he's going to help me get in."  When asked what that meant to her, L.C. said, "Forcing me into the car."  She testified she got into the car.

- Once they got to the motel, L.C. testified defendant accused her of cheating and said she "better give him [the guy's] name or [defendant's] going to kill [L.C.] and [the guy]."

- Over the course of the five or six hours that defendant kept L.C. at the motel, he told her that if she said something and she got "him

9.

into jail or prison again that he's going to do his time as easily as he can. Once he gets out, he's going to kill [her] and all [her] family."

- Over that five- to six-hour time period he also "told [her] something about getting a gun from some guy that he knows," and that he threatened to kill her and her family about five or six times. She testified she was scared.

- After L.C. dropped him off at work, he started calling and texting her numerous times. She did not answer the calls or listen to the voicemails, but in one message, evidently a text, he was saying he was "going to have plenty of money. He's not going to have to lift a finger. He can just have somebody else do it." She took this to mean "he can have somebody just kill me without him needing to get his hands dirty."

- Another text message during that time said "'You have 15 minutes to bring the [vehicle], fucking retard. Either you call me or bring the [vehicle]. 15 minutes call me. You'll see if you don't.'"

- J.C. testified that when they were in the motel room, defendant said "he was going to buy a pistol to kill my mom and the whole family."

- I.C. testified she heard defendant say to L.C. in the truck that he was going to kill L.C. and leave J.C. and I.C. in the desert.

## B. Legal Standard

The trial court has a sua sponte duty to give a unanimity instruction when "'there is a risk the jury may divide on two discrete crimes and not agree on any particular crime .…'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 878.) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

10.

No unanimity instruction is required, however, if the case falls within the continuous-course-of-conduct exception.**3**  The exception is applicable when (1) the acts are so closely connected in time as to form part of one transaction; (2) the defendant tenders the same defense or defenses to each act; and (3) there is no reasonable basis for the jury to distinguish between them.  (*People v. Lueth* (2012) 206 Cal.App.4th 189, 196; see *People v. Williams* (2013) 56 Cal.4th 630, 682 [unanimity instruction may not be required where criminal acts took place within a very small window of time, the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish among them].)

Further, no unanimity instruction is required when the prosecutor elects the specific act relied upon to prove the charge to the jury.  (*People v. Brown* (2017) 11 Cal.App.5th 332, 341.)  "The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument.  [Citations.]  Such an election removes the need for a unanimity instruction.  [Citation.]  [¶]  Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it."  (*Ibid*.)

We review de novo a claim that the trial court failed to properly instruct the jury on the applicable principles of law.  (*People v. Covarrubias, supra,* 1 Cal.5th at p. 919.)

**C.**  **Analysis**

Defendant argues the continuous-course-of-conduct exception is not applicable here because the jury could have rationally viewed the threats against L.C. that occurred at different times:  (1) threat that L.C. get in the car or he would help her get in the car; (2) at least one threat in the car; (3) threats made to L.C. at the motel; and (4) text threats

---

**3**     Not relevant here, the continuous-course-of-conduct exception also applies "'when … the statute contemplates a continuous course of conduct of a series of acts over a period of time' [citation]."  (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

after L.C. dropped defendant off at work the next day. Defendant asserts there were different defenses to some of these statements: not all of them might have been unanimously viewed as a threat, while others might have been deemed too conditional in nature.

For the unanimity instruction to be required, however, there must be evidence that suggests more than one discrete criminal threat crime—not just the existence of multiple threats. (*People v. Grimes* (2016) 1 Cal.5th 698, 727 ["A unanimity instruction is required if there is evidence that more than one crime occurred, *each of which could provide the basis for conviction under a single count*." (Italics added.)]; see *People v. Lueth, supra*, 206 Cal.App.4th at p. 196 ["a unanimity instruction is not required when the evidence shows only one discrete crime"].)

As the jury was instructed, the evidence necessary to establish a criminal threat crime includes the following: (1) that the defendant willfully threatened to commit a crime that would result in death or great bodily injury to another person; (2) that the defendant made the threat with the specific intent that it be taken as a threat, even if there is no actual intent of carrying it out; (3) that the threat—which may be made verbally, in writing, or by means of an electronic communication device—was, on its face and under the circumstances in which it was made, so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat; (4) that the threat actually caused the person threatened to be in sustained fear for his or her own safety or for his or her immediate family's safety; and (5) the threatened person's fear was reasonable under the circumstances. (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

As to L.C.'s testimony that defendant told her to get in the car when he picked her up on October 15, 2020, this could have been considered a threat. However, although L.C. testified that she complied with defendant's demand in this regard, she never testified this statement caused her any subjective fear. Defendant's words alone, even if

12.

considered a threat that would result in great bodily injury, were insufficient by themselves to provide a basis for a criminal threat conviction and, thus, could not, by themselves, suggest a discrete criminal threat crime. (*People v. Wilson* (2015) 234 Cal.App.4th 193, 201 [criminal threat not complete upon issuance of a threat; it depends on the recipient suffering sustained fear as a result of the communication]; see *People v. Grimes, supra*, 1 Cal.5th at p. 727 ["A unanimity instruction is required if there is evidence that more than one crime occurred, *each of which could provide the basis for conviction under a single count.*" (Italics added.)].)

Defendant argues I.C.'s testimony that defendant threatened L.C. in the car could have constituted a separate threat crime, but L.C. testified defendant did not threaten her in the car. There was no evidence, nor could there be, that L.C. subjectively experienced fear based on a threat she did not perceive; I.C.'s testimony about a threat in the car could not constitute, nor was it sufficient to suggest, a separate and discrete criminal threat crime against L.C.

Defendant also maintains some of the threats at the motel could constitute discrete criminal threat crimes, but they were not part of a continuous course of conduct because they were reasonably distinguishable from each other and were subject to different defenses. For example, some threats pertained to defendant getting a gun, but that could have been perceived by the jury as conditional or simply not credited because of some of the witnesses' inconsistent testimony about when a gun may have been mentioned that night. Notably, the mere fact that defendant could not carry out a threat immediately is not a legal basis to conclude the threat was conditional, and the jury was instructed accordingly. (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679 [gravity of purpose and an immediate prospect of execution of the threat "does not require an immediate ability to carry out the threat"].)

But more importantly, L.C. testified these threats were delivered seriatim during the continuous period of time while defendant was questioning and assaulting her at the

13.

motel. "[S]ection 422 authorizes only one conviction and one punishment per victim, per threatening encounter during which the victim suffers a single period of sustained fear …." (*People v. Wilson, supra*, 234 Cal.App.4th at p. 202.) The prosecutor did not elicit testimony about whether each separate threat at the motel scared L.C. or successively increased her fear. Instead, after testifying about all the threats to kill L.C. and her family that defendant made at the motel, the prosecutor asked L.C. whether she was scared that night, to which L.C. responded she was. While the threats at the motel were delivered over several hours, it was one continuous encounter and there is no evidence L.C. experienced more than one period of sustained fear during this encounter. She did not testify her fear increased from one threat to the next, she testified instead how the threats at the motel, as a group, made her fearful. (See *People v. Roles* (2020) 44 Cal.App.5th 935, 942–943 [multiple voicemail messages victim listened to together in a series resulted in only one period of sustained fear and could support only one criminal threat conviction].) Thus, the evidence did not suggest more than one discrete crime of criminal threats during the encounter at the motel.

Finally, L.C. testified that after she dropped defendant off at work, defendant started texting and calling her, ordering and threatening her to return the car. These later threats were not part of the series of threats at the motel, but the prosecutor did not elicit any testimony about whether these subsequent messages placed L.C. in any kind of fear—either additional or renewed. In fact, L.C. testified she did not care about his threats to report the vehicle stolen because that was "his way of trying to control [her]" and if she took the car back to him, he would do what he always did and throw her in the car and not let her leave. And, indeed, she did not comply or return the vehicle. Because there was no evidence suggesting L.C. experienced any subjective fear *as a result of these separate threats*, they could not constitute or suggest a separate, discrete crime of making a criminal threat. (*People v. Wilson, supra*, 234 Cal.App.4th at p. 201 [violation

14.

of § 422 "depends on the recipient of the threat suffering 'sustained fear' as a result of the communication"].)

In sum, the evidence suggested only one discrete criminal threat crime, and it related to threats defendant made during the uninterrupted encounter with L.C. at the motel. Indeed, in her closing argument, the prosecutor specifically argued it was defendant's oral threats to kill L.C. that constituted the criminal threat crime under count 2. Although there were multiple threats made during the motel encounter, there was evidence of only one sustained period of fear by L.C.; as such, there could not be two discrete criminal threat crimes arising from that series of threats.

To the extent the jury did not agree on exactly which threats at the motel supported the criminal threat conviction, this merely presents the possibility the jury could divide or be uncertain as to the exact way defendant was guilty of a single discrete crime. (*People v. Russo, supra*, 25 Cal.4th at p. 1135.) Such a possibility does not require a unanimity instruction. (*Ibid*.)

## II.    Denial of Defendant's *Romero* Motion

### A.    Background

Defendant filed a motion pursuant to *Romero*, asking the court to exercise its discretion to strike defendant's prior strike offense for violation of section 136.1, subdivision (b)(1). Taking facts from police reports, defendant explained the prior strike offense occurred in April 2013. L.C. told officers that defendant had entered the house while she was sleeping, and an argument ensued. Defendant left, but then returned around 4:00 a.m., he picked L.C. up by her elbow and walked her outside as she resisted. Defendant shoved her onto the porch, and then told her to get into the vehicle, which she resisted. He opened the car door, pushed her inside, and drove to a different house. He questioned her about whether she was cheating, took her phone away, and removed the battery. At some point, he grabbed her around the neck and punched her. Officers observed visible injuries to L.C.'s throat, face, head and body.

15.

Defendant argued the current offenses involved no injury or, in any event, did not cause any serious injury. The prior and the current offenses occurred while defendant was possibly under the influence and resulted from his substance abuse problem. The strike offense is more than seven years old, and there has been no intervening criminal behavior. At the sentencing hearing, defense counsel reiterated these factors and noted that up until his arrest in this case, defendant was a productive member of society; he had been holding down three different jobs and providing some financial support to his children. The 2013 offense, while a serious felony, was not a violent one. While defendant had some probation violations, he did ultimately complete his probation and a batterer's intervention program. Defense counsel also noted a substance abuse evaluation was attached to defendant's *Romero* motion, which corroborated defendant's addiction issue and should be considered a mitigating factor.

In May 2021, defendant submitted a letter to the court indicating that while he disagreed with the verdict and did not feel that justice had been served, he sought rehabilitation. He denied ever harming L.C. in any way, and asked the court to assign him to a rehabilitation program rather than sentence him to prison.

At sentencing, the court considered defendant's *Romero* motion and the attached documentation, a letter from defendant and his in-court statement at sentencing, and counsels' arguments. The court observed that of the relevant factors, only defendant's substance abuse arguably tilted in his favor. After considering the factors, the court concluded "[t]his case obviously involves violence and threat[s] of violence, it involves prior criminal history with the same victim. The conduct in that [prior] case was severe and significant, including a strike resulting from those convictions. The offenses there were not frankly too far off. It was 2013, and less than 7 years we are back to square one unfortunately. The [d]efendant had the opportunity and the benefit of prior treatment program[s], but nevertheless is here again." On this basis, the court denied the *Romero* motion.

## B.	Analysis

Pursuant to *Romero*, a trial court may strike a prior violent or serious felony conviction allegation under the Three Strikes law[4] "'in furtherance of justice' pursuant to … section 1385[, subdivision] (a)." (*People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*).)  To determine whether dismissal of a prior strike would be in furtherance of justice, courts must consider both the constitutional rights of the defendant and the interests of society represented by the People.  (*Romero, supra*, 13 Cal.4th at p. 530.)

In making this assessment, the court should consider whether "in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of [the defendant's] background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he [or she] had not previously been convicted of one or more serious and/or violent felonies." (*Williams, supra*, 17 Cal.4th at p. 161.)

A trial court's decision under *Romero* is reviewed for an abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).)  An abuse of discretion is not shown just because "'reasonable people might disagree about whether to strike one or more' prior conviction allegations.  [Citation.] … '[W]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance' [citation]." (*Id.* at p. 378.)

Defendant argues sentencing him to more than seven years in prison is "overkill" in light of the fact there were no injuries in this case, or, at the most, very insubstantial injuries, the prior strike was seven years old, and the problems seemed to relate to defendant's substance abuse problem.  Moreover, he had been productively working and supporting the children.

---

**4**	Sections 667, subdivisions (b)–(i), 1170.12, subdivisions (a)–(d).

Defendant's argument, however, is akin to requesting that we reweigh the relevant factors, which we cannot do. Moreover, it is not enough to show that reasonable people might disagree whether striking the prior strike is reasonable. Here, defendant's prior strike involves domestic violence against the same victim as the current offenses, and the current violence against L.C. was committed in front of their children. As the trial court pointed out, although there was no intervening criminal history between 2013 and 2020, defendant was right back to "square one" with the same victim involving the same conduct. Moreover, while defendant characterizes the injuries as nonexistent or minimal, the trial court observed there was violent conduct in this case just like the conduct in 2013, and the court noted it considered the psychological pain and suffering to L.C. and the children caused by the current offenses to be "both immense and intense." And, while defendant's substance abuse issue was arguably a mitigating factor, he had had the opportunity and benefit of treatment programs before, but "nevertheless is here again."

The trial court considered and balanced the relevant factors and reached a decision in conformity with the spirit of the law. Even assuming another court might reach a different conclusion in the first instance, defendant has not demonstrated the trial court abused its discretion in denying the *Romero* motion. (*Carmony, supra*, 33 Cal.4th at p. 378.)

## III.    Section 654

Defendant claims the punishment for false imprisonment by violence under count 3 must be stayed pursuant to section 654 because it was part of an indivisible course of conduct with count 1 for corporal injury and count 2 for criminal threats. Defendant argues these offenses were all committed pursuant to the single objective of punishing L.C. for infidelity, tampering with defendant's phone, and general dissatisfaction with their relationship.

The People assert the record evidences several separate objectives, and section 654 is not applicable. Defendant tried to have sex with L.C., so it could be inferred that

18.

falsely imprisoning L.C. was for the purpose of sex, the objective in assaulting L.C. was to punish and control her when she would not say or do what he wanted at the motel, and the threats were meant to intimidate L.C. and facilitate future crimes.

## A.    Legal Standard

Section 654, subdivision (a), provides in relevant part as follows:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."[5]  Section 654 precludes multiple punishments not only for a single act, but for an indivisible course of conduct.  (*People v. Hester* (2000) 22 Cal.4th 290, 294.)

Determining "[w]hether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry .…"  (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)  "We first consider if the different crimes were completed by a 'single physical act.'  [Citation.]  If so, the defendant may not be punished more than once for that act.  Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single '"intent and objective"' or multiple intents and objectives."  (*Ibid.*)

"It is [the] defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible.  [Citations.]  We have traditionally observed that if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once.  [Citation.]  [¶]

---

[5]    This version of section 654 became applicable on January 1, 2022, and applies retroactively to all nonfinal cases.  (Stats. 2021, ch. 441, § 1; *People v. Mani* (2022) 74 Cal.App.5th 343, 379 [amendment to § 654 applies retroactively].)  At the time of sentencing, section 654 provided that "[a]n act or omission that is punishable in different ways by different provisions of law *shall be punished under the provision that provides for the longest potential term of imprisonment*, but in no case shall the act or omission be punished under more than one provision.…"  (§ 654, former subd. (a), italics added.)

If, on the other hand, [the] defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).) Even where a defendant has similar but consecutive objectives, multiple punishments are permitted. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211–1212.)

"The question of whether the defendant held multiple criminal objectives is one of fact for the trial court, and, if supported by any substantial evidence, its finding will be upheld on appeal." (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1466, disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 199; accord, *People v. Moseley* (2008) 164 Cal.App.4th 1598, 1604.) "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.)

## B. Analysis

The trial court indicated there might be an argument for application of section 654 as to count 3, but refused to stay the punishment under section 654 and imposed a concurrent sentence for the conviction under count 3 for false imprisonment.

This case does not involve a single physical act; therefore, we focus on the second step of the analysis governing section 654: whether the crimes were a "'course of conduct deemed to be indivisible in time.'" (*Harrison, supra*, 48 Cal.3d at p. 335, quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639; accord, *People v. Corpening, supra*, 2 Cal.5th at p. 311.) Generally, "'"[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'""

(*People v. Capistrano* (2014) 59 Cal.4th 830, 885, overruled in part on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104.)

However, "'[b]ecause of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an "act or omission," there can be no universal construction which directs the proper application of section 654 in every instance.'" (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514, quoting *People v. Beamon, supra*, 8 Cal.3d at p. 636; accord, *Harrison, supra*, 48 Cal.3d at p. 336.) Section 654 "is intended to ensure that [the] defendant is punished 'commensurate with his culpability[]'" (*Harrison, supra*, at p. 335), and the California Supreme Court has cautioned that "a 'broad and amorphous' view of the single 'intent' or 'objective' needed to trigger the statute would impermissibly 'reward the defendant who has the greater criminal ambition with a lesser punishment[]'" (*id.* at pp. 335–336, quoting *People v. Perez* (1979) 23 Cal.3d 545, 552–553).

Defendant argues the trial court erred by not staying his sentence for false imprisonment effected by violence because the sole intent in committing that crime was to punish L.C. and keep her isolated to facilitate the corporal injury and criminal threat crimes. That is one possible inference that could be drawn from the evidence, but it is not the only one that could be made. Defendant spent five to six hours questioning L.C. about a range of topics, including her purported infidelity and tampering with his phone, and he assaulted her multiple times when she gave answers that displeased him. For example, L.C. testified that he had grabbed her by the hair and asked her if they were going to get married. When she said yes, he pulled her hair even harder, and asked whether they were going to get married. When she said no, it still "wasn't the right answer." L.C. testified this type of questioning and assaulting went on for hours. There was evidence defendant intended to keep her in the motel room so that he could confront and interrogate her, not merely to facilitate, or be facilitated by, his assaults and threats against her.

21.

Further, defendant made threats that if L.C. reported what happened, he was going to kill her and her family. From this, it could be inferred defendant made threats with the intent to prevent her from reporting any of his acts, separate from his intent with respect to keeping her in the motel room to interrogate her or assaulting her when he disliked her answers. (*People v. Coleman* (1989) 48 Cal.3d 112, 162–163 [separate intent and objective in assault of unresisting robbery victim because it could be concluded "[the] defendant committed the assault with the intent and objective of preventing the victim from sounding the alarm about the murder" separate and not incidental to the robbery].)

In sum, the evidence gives rise to an inference defendant harbored multiple separate objectives in falsely imprisoning L.C. in the motel room, assaulting her, and threatening her over this extended time period. The court could reasonably conclude defendant's act of restricting L.C.'s liberty was not intended to facilitate assaulting and threatening her. (*People v. Beamon, supra*, 8 Cal.3d at pp. 638–639 [where the defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he may be punished for independent violations even though violations shared common acts or were parts of an otherwise indivisible course of conduct].) The trial court did not err by failing to apply section 654 and staying the punishment imposed on count 3.

## IV. Correction of Abstract of Judgment

The parties correctly note the abstract of judgment does not accurately reflect the trial court's oral judgment.

When an abstract of judgment does not accurately reflect the judgment imposed, we have "the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties." (*People v. Jones* (2012) 54 Cal.4th 1, 89.) The abstract of judgment reflects the trial court imposed a concurrent term under count 3, but then stayed its execution. Yet, the court expressly refused to apply section 654 to

stay the punishment imposed under count 3.  Thus, the abstract of judgment contains a clerical error that must be corrected.

## DISPOSITION

The judgment is affirmed.  The trial court shall issue an amended abstract of judgment reflecting the term of imprisonment for count 3 was not stayed.  The trial court shall forward the amended abstract of judgment to the appropriate authorities.


MEEHAN, J.

WE CONCUR:


PEÑA, Acting P. J.


SNAUFFER, J.